**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Aryon Williams, Jr., | CIV 97-1239-PHX-PGR |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | |
| Dora B. Schriro, et al., | **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | |

Aryon Williams Jr. ("Petitioner") filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. Eight of Petitioner's claims have been properly exhausted.  (Dkts. 37, 108.)[1]  These claims are fully briefed (Dkts. 44, 48, 53, 85, 93, 95), and the Court reviews them on the merits in this Order.  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief.

**FACTUAL AND PROCEDURAL BACKGROUND**

On June 23, 1992, Petitioner was convicted of armed robbery and the attempted murder of Norma Soto, as well as the murder of Rita DeLao.[2]  Because Petitioner's remaining claims relate solely to his conviction and sentence for the murder of DeLao, the

---

[1]  "Dkt." refers to the documents in this Court's case file.

[2]  Various sources in this case use different renditions of the victim's surname, including "DeLaO" and "Delao."  This Court follows the lead of the Arizona Supreme Court in using the name "DeLao."

following factual background focuses primarily on that crime.[3]

On January 27, 1990, Petitioner and DeLao, his former girlfriend and the mother of his older son, spent part of the day together. At the time, Petitioner lived in an apartment with Michelle Deloney, his current girlfriend and the mother of his younger son. After midnight, DeLao telephoned Petitioner twice and stated she wanted to come over to the apartment; because Deloney was at the apartment, Petitioner told DeLao not to come. DeLao appeared at the apartment around 3:00 a.m. Petitioner joined DeLao outside the apartment, where they argued. DeLao confronted Petitioner with a gun, and he disarmed her.

Several hours later, DeLao's body was found on a dirt road in Arizona City, approximately twenty minutes by car from Petitioner's apartment. DeLao had been shot in the elbow and twice in the thigh and had sustained multiple blunt force injuries; she had been dragged and it appeared she had been run over by a car. Bullets recovered from her body were consistent with the caliber of weapon DeLao had displayed earlier that morning outside Petitioner's apartment. Pieces of a steam iron were recovered at the scene.

The next day, Monday, January 29, Petitioner told Deloney that he thought he had seen DeLao's car near a park in Casa Grande. Petitioner and Deloney drove to the car, which was then being processed by a Pinal County Sheriff's technician. Petitioner told the technician that he thought the car was DeLao's and that he had last seen her around 3:15 a.m. on Sunday morning. Petitioner's fingerprints were found on the exterior of DeLao's car. Blood was found inside the vehicle, some of which was matched by type and enzyme marker to DeLao, and on the underside of the car. Petitioner voluntarily went to the Casa Grande Police Department, where he was interviewed and informed that DeLao was dead. A detective returned to Petitioner's apartment with him and, after obtaining Petitioner's consent, conducted a search and seized all of Petitioner's dirty clothing. Deloney told the detective that Petitioner was at home at the time of the murder. After the detective left,

---

[3]  Unless otherwise noted, the facts are summarized from the Arizona Supreme Court's opinion in *State v. Williams*, 183 Ariz. 368, 371-74, 904 P.2d 437, 440-43 (1995).

1   Petitioner told Deloney that his fingerprints would be found on DeLao's car because he had

2   been with her the prior day.  The facts as set forth to this point are, in essence, uncontested.

3         In the early hours of March 5, 1990, Petitioner entered a Circle K convenience store

4   and asked the cashier, Norma Soto, where her boyfriend was.  Soto responded and Petitioner

5   left.  Approximately an hour later, Petitioner returned with a gun and accused Soto of

6   spreading rumors that he had killed DeLao.  He also asked for the money in the cash register.

7   Soto then refused his request to get in his car and he shot her in the forehead, abdomen, and

8   hand.  On several occasions, Soto identified Petitioner as the person who robbed her and shot

9   her; however, at the emergency room she once stated that "John B. Dixon did it," and at other

10  times she stated that she did not know who shot her.

11        Around 8:00 a.m. on the morning of March 5, Deloney informed Petitioner that the

12  police were looking for him in connection with a shooting earlier that day.  Petitioner denied

13  committing the shooting, but gave his gun to Deloney to hide along with some cash.

14  Deloney was stopped while driving away and the gun and money were recovered.  Police

15  recovered bullet casings at the scene which matched Petitioner's gun.  At trial, Petitioner

16  denied involvement in the shooting and testified that he had left his gun in a friend's car that

17  night.  Petitioner was arrested that day for the attempted murder of Soto; in statements to

18  police, Deloney then implicated Petitioner in the murder of DeLao.

19        Deloney testified to the following at Petitioner's trial.  On January 28, after going

20  outside to see DeLao, Petitioner came back into the apartment, took his keys and left, not

21  returning until 7:00 or 8:00 a.m.  (RT 5/15/92 at 154.)[4]  When he left he was wearing gray

22  stonewashed jeans (*id.* at 152), but when he returned he was wearing gray sweatpants and

23  a blue scrub top that Deloney had never seen before (*id.* at 156-57); Deloney admitted that

24  _____

25        [4] "RT" refers to the reporter's transcripts from Petitioner's trial.  "ROA" refers to the
    docket numbers of the thirteen-volume record on appeal from trial and sentencing for
26  Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-93-0138-AP).  The
    original reporter's transcripts and certified copies of the trial and post-conviction records
27  were provided to this Court by the Arizona Supreme Court and the Pinal County Superior
    Court.  (*See* Dkts. 36, 82, 97.)
28

she had lied when she initially told a detective that Petitioner was wearing gray sweatpants when DeLao came to the apartment (RT 5/20/92 at 95-96, 100-01, 102). At some point, Petitioner told Deloney that he burned the clothes he had been wearing. (RT 5/19/92 at 5.) Deloney saw DeLao's shoes on the kitchen floor Sunday morning, but they were gone later in the day (*id.* at 155-56); prior to trial, Deloney had not told law enforcement or defense counsel that she saw DeLao's shoes in the apartment (RT 5/21/92 at 8).

Deloney's trial testimony also included the following statements. After the first police interview at the apartment, Petitioner told her to tell the police that he was with her all night. (RT 5/15/92 at 171.) At some point, he also told her and his parents that he knocked DeLao down after she brandished the gun and that she hit her head and was bleeding outside the apartment. (*Id.* at 175.) The day after DeLao died, Petitioner told Deloney that friends of his had killed DeLao in his presence, but that he had only kicked her in the face. (*Id.* at 164-65.) A few weeks later, Petitioner admitted to Deloney that he had killed DeLao; specifically, that he had shot her in the arm and side, hit her in the head with a pole and iron, and ran back and forth over her with a car. (RT 5/19/92 at 19-20.) According to Deloney, after Petitioner confessed to her, he threatened to kill her if she ever told anyone. (*Id.* at 21.)

At trial, Deloney acknowledged feeling pressured during the March 5 police interview, after the gun and cash were recovered from her, because police accused her of lying and warned her to tell the truth if she wanted to see her son again and avoid being charged with a crime and getting into big trouble; she admitted that she felt afraid and threatened, and knew by the questioning what the officers wanted to hear. (RT 5/20/92 at 154-55, 173-77.) Further, she acknowledged that she had talked to Petitioner five to ten times in March 1990, while he was in jail, and that their discussions were not threatening, but focused on their relationship and their son. (*Id.* at 192-93.) While Petitioner did not have a telephone number at which to contact her from March to November (*id.* at 193-94), between November 1990 and early January 1991, Deloney accepted numerous collect calls from Petitioner, who remained jailed; during those calls, he never threatened her or tried to influence her participation in the case (*id.* at 199-205, 215).

1    To counter Deloney's testimony, Petitioner testified that after disarming DeLao he
2  returned the gun to her and she drove away uninjured. (RT 6/18/92 at 166, 172.) He
3  denied ever threatening Deloney or telling her that he had killed DeLao. (*Id.* at 182, 231.)  He
4  testified that one of DeLao's brothers told him how DeLao was murdered, information which
5  he relayed to Deloney. (*Id.* at 227; RT 6/19/92 at 52-53.)

6    DeLao's brother testified that although he did have phone conversations with
7  Petitioner, he did not tell Petitioner how DeLao died. (RT 6/10/92 at 241.)  Two of
8  Petitioner's co-workers testified that he told them that DeLao came to his house with a gun,
9  which he took away, and that her body was found and she had been shot, beaten up and run
10  over. (RT 5/22/92 at 15, 19-20.)

11    On Sunday afternoon, January 28, Petitioner took his older son to Phoenix pursuant
12  to the standard arrangement with DeLao, and dropped him at DeLao's parents' home. (RT
13  6/18/92 at 193.) Members of DeLao's family, who never liked Petitioner (RT 6/10/92 at 238;
14  RT 6/11/92 at 58), testified that they drove to Petitioner's parents' house that night and
15  Petitioner told them they would never find DeLao and he would get custody of his son (RT
16  6/11/92 at 47-48, 50; RT 6/22/92 at 45-46).  Petitioner and his family members testified that
17  he never made such statements. (RT 6/12/92 at 129; 6/16/92 at 80-81, 239; RT 6/18/92 at
18  201.)  The trial court admitted evidence that, prior to the murder, Petitioner had burned
19  DeLao's car, slashed her tires, and shot at her apartment.

20    Petitioner was initially indicted for armed robbery and the attempted murder of Soto;
21  he was subsequently indicted for the first degree murder of DeLao.  After a consolidated trial,
22  Petitioner was convicted on all charges.  The trial court found two aggravating factors, that
23  Petitioner had been previously convicted of a felony involving the use or threat of violence,
24  under A.R.S. § 13-703(F)(2), and that the crime was heinous and depraved, under (F)(6).
25  After determining that the mitigating circumstances were not sufficient for leniency, the court
26  sentenced Petitioner to death for the murder.  On direct appeal, Petitioner's conviction and
27  sentence were upheld.  *State v. Williams*, 183 Ariz. 368, 386, 904 P.2d 437, 455 (1995).

28

# STANDARD FOR HABEAS RELIEF

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claim on habeas review.  "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 653-54.  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*).  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);

1    *Miller-El II*, 545 U.S. at 240.

2           As the Ninth Circuit has noted, application of the foregoing standards presents

3    difficulties when the state court decided the merits of a claim without providing its rationale.

4    *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

5    1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).   In those

6    circumstances, a federal court independently reviews the record to assess whether the state

7    court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d

8    at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

9    court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167

10   (citing *Delgado*, 223 F.3d at 981-82); *see also, Himes*, 336 F.3d at 853.  Only when a state

11   court did not decide the merits of a properly raised claim will the claim be reviewed de novo,

12   because in that circumstance "there is no state court decision on [the] issue to which to

13   accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

14   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

15                                    **DISCUSSION**

16         **Claim 3**

17         Petitioner alleges that preindictment delay on the first degree murder charge violated

18   his right to due process under the Sixth and Fourteenth Amendments.  Specifically, he alleges

19   that he was prejudiced by the nine-month delay in indicting him for the murder charge

20   because a critical defense witness, William Dean Hampton, who would have impeached

21   Deloney's testimony, was murdered prior to trial.

22         Background

23         DeLao was murdered on January 28, 1990.  On March 5, Soto was shot and Petitioner

24   was arrested for that crime.  Petitioner was indicted for the murder of DeLao on December

25   20, 1990.

26         The State represented to the trial court that the original prosecutor on the case did not

27   recall why Petitioner was not indicted for DeLao's murder simultaneously with his arrest for

28   shooting Soto.  (RT 7/1/91 at 8.)  A second prosecutor took over the cases in April 1990; he

informed the Court that he was prosecuting another matter during the first two months he was assigned to Petitioner's cases. (*Id.* at 11.)  Both parties agreed that the key witness, Deloney, was pregnant and, by July 1990, did not want to participate in any proceedings. (*Id.* at 10, 11.)  The prosecutor decided to indict in December because Deloney was available, he thought enough time had passed, and the investigation was complete. (*Id.*)

While investigating DeLao's murder, the State interviewed Hampton at the Pinal County Jail and he informed them he had no information about Petitioner's murder case; the prosecutor did not believe any written report was generated from that contact. (RT 6/24/91 at 3-4.)  At a subsequent proceeding, the State agreed to provide Petitioner a report of the interview with Hampton, and the court ordered that any available notes from that interview be disclosed. (RT 7/1/91 at 5-6.)  As of August 1991, the State indicated it would either disclose the notes from the interview of Hampton or not use his statement at trial. (RT 8/5/91 at 9-10.)  Hampton was not on the State's November 1991 witness list for trial. (ROA 248).  Hampton was murdered in January 1992.

Petitioner's consolidated trial for the crimes against Soto and DeLao began in May 1992.  According to Deloney's testimony, Petitioner told her that after he killed DeLao, Hampton helped him burn his clothes and shoes. (*See* RT 5/15/92 at 157; RT 5/20/92 at 42-44, 56; RT 5/21/92 at 43-44, 106.)  A declaration from Hampton's brother, James Hampton, filed for the first time in this Court, states that his brother denied the rumors going around at the time of the murder that he was involved in the crime or getting rid of evidence from the crime. (Dkt. 47.)  James Hampton further declares that prior to his murder, Hampton believed he would be called as a witness at Petitioner's trial and he would have testified that he did not participate in the murder, had no reason to believe Petitioner participated in the murder, and that he did not help Petitioner burn any items after the murder. (*Id.*)

The Arizona Supreme Court denied this claim, finding that the record did not reveal any reason for the delay and that Petitioner had not demonstrated prejudice. *Williams*, 183 Ariz. at 379, 904 P.2d at 448.

1     <u>Analysis</u>

2          To establish a due process violation arising from preindictment delay, a petitioner

3 must demonstrate actual prejudice resulting from the delay. *United States v. Lovasco*, 431

4 U.S. 783, 790 (1977). While prejudice is a prerequisite for a due process claim, it is not,

5 standing alone, sufficient; rather, a court must consider the reasons for the delay. *Id.* at 791.

6 The Supreme Court has not prescribed a set formula for the elements of such a claim because

7 "[t]o accommodate the sound administration of justice to the rights of the defendant to a fair

8 trial will necessary involve a delicate judgment based on the circumstances of each case."

9 *United States v. Marion*, 404 U.S. 307, 325 (1971). Investigative delay does not deprive a

10 defendant of due process even if it caused some prejudice; however, prosecutorial delay for

11 tactical reasons, to harass the defendant, or in reckless disregard of facts indicating that a

12 defendant's ability to defend himself is at a discernable risk implicates a defendant's due

13 process rights. *Lovasco*, 431 U.S. at 795 & n.17 (finding no due process violation after 18-

14 month investigative delay and some prejudice); *Marion*, 404 U.S. at 324-25 (finding no due

15 process violation after 38-month delay, without culpable intent, and no actual prejudice).

16          The Court finds that Petitioner did not suffer actual prejudice from the loss of

17 Hampton's testimony. The possible testimony of Hampton, as alleged by Petitioner, was

18 nothing more than a denial of involvement in the crime.[5] While Deloney testified that

19 Petitioner told her that Hampton helped destroy evidence of DeLao's murder, Hampton's

20 denial of that statement would not be strong impeachment. There was no evidence at trial,

21 from Deloney or otherwise, that Hampton himself ever admitted any involvement in the

22 crime. Petitioner testified and denied any involvement in the crime and asserted that all of

23 Deloney's statements to the contrary were false. Further, defense counsel conducted a

24 zealous cross-examination of Deloney for two days (RT 5/19/92 at 141-206; RT 5/20/92 at

25

26         [5] Petitioner requests an evidentiary hearing to demonstrate prejudice. However, accepting Petitioner's allegations as true regarding Hampton's possible testimony, the Court

27 finds that Petitioner is not entitled to relief. Therefore, a hearing is not warranted. *See Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-*

28 *Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254(e)(2).

4-215; RT 5/21/92 at 7-22, 73-115), challenging her repeatedly on whether she had ever mentioned before trial that Petitioner said he burned his clothes and not just his shoes (RT 5/20/92 at 42-44; RT 5/21/92 at 42).  Additionally, the issue of Petitioner burning his clothes and shoes arose several times during Deloney's direct and cross-examinations (*see* RT 5/15/92 at 157; RT 5/20/92 at 42-44, 56); however, Hampton's alleged involvement was not referenced until redirect by the prosecutor, and then on recross the defense succeeded in getting Deloney to concede that she may never have mentioned Hampton to law enforcement prior to trial (RT 5/21/92 at 43-44, 106).

Further, the record indicates that trial counsel did not view Hampton as the critical witness Petitioner now portrays him to be.  Although trial counsel repeatedly requested the State's record regarding its interview of Hampton, the defense never interviewed him.  On August 5, 1991, the State agreed to disclose any statement by Hampton or not use it at trial. (RT 8/5/91 at 9-10.)  On November 19, 1991, the State disclosed its list of trial witnesses and did not list Hampton.  (ROA 248).  At that time it was clear to the defense that there would be no disclosure from the State, yet in the two months prior to his death the defense did not interview Hampton.

Finally, even if Petitioner had suffered some prejudice by virtue of Hampton's death prior to trial, it was not the result of preindictment delay.  Hampton was alive at the time of the indictment and for more than a year thereafter.  The fact that Hampton was not alive by the time of trial, which did not begin until eighteen months after the indictment, is due to pretrial delay not preindictment delay.

Moreover, even if Petitioner had shown some level of prejudice, the reasons for the delay militate against a finding of a due process violation.  First, the "delay" was only a nine-month period, shorter than any statute of limitations.  Additionally, the grounds for the delay, to the extent set forth in the record, appear to be benign – prosecutorial staffing changes and schedules, and witness accommodation.  *See United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1989) (finding no due process violation when delay caused by efforts to interview witnesses and the transfer of case agents). In light of the relatively short delay and the lack

1    of any culpability on the part of the State, any prejudice would not rise to a due process

2    violation.

3           Petitioner is not entitled to relief and Claim 3 is denied.

4           **Claim 8**

5           Petitioner alleges that the trial court violated his rights to equal protection and due

6    process when it refused to authorize funds for a mental health evaluation to assist the defense

7    at sentencing.   Specifically, Petitioner contends he was entitled to the appointment of a

8    mental health professional in light of the evidence of his addiction to cocaine.

9           Background

10          Deloney testified at trial that Petitioner told her he had been doing cocaine with

11   DeLao on the Saturday before her murder (RT 5/21/92 at 72-73) and that after her death he

12   had seen DeLao's ghost (RT 5/19/92 at 21).   Petitioner denied making either of those

13   statements to Deloney.  (RT 6/18/92 at 153, 182.)  In July 1992, after Petitioner had been

14   convicted of capital murder, trial counsel filed a motion for a mental health examination.

15   (ROA 591.)   Counsel requested the evaluation to "explore the psychological issues

16   surrounding Norma Soto's shooting, the death of Rita DeLao, and the effect of intoxication

17   and/or possibly drugs as presented by the State through its witness Michelle Deloney." (*Id.*)

18   In a pre-sentence disclosure, Petitioner listed lack of a violent propensity, possible

19   cocaine/drug/alcohol use, and duress as mitigating factors.  (ROA 603.)  In reply to the

20   State's objection, Petitioner argued that an expert was needed with respect to the presentation

21   of various mitigation information, including Petitioner's significant cocaine problem as

22   presented by the State, his mental capacity, duress at the time of the crimes, his childhood,

23   his strong family relationship, and his appropriate influence in other's lives, as well as to

24   rebut any State experts regarding Petitioner's propensity for violence.  (ROA 605.)  At oral

25   argument on his motion, Petitioner's counsel again noted that the evaluation was needed to

26   address the effect of intoxication or drug use and the accompanying psychological factors.

27   (RT 8/3/92 at 5-6.)  The court denied the request for a mental health examination for lack of

28   cause.  (ROA 610.)  As an additional mitigating factor, Petitioner alleged that the crime was

1    "out of character." (ROA 625.)  Petitioner renewed his request for the appointment of a

2    psychologist pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985).  (ROA 630 at 2.)

3         In its sentencing memorandum and at the aggravation/mitigation hearing, the State

4    alleged as aggravating factors that Petitioner was previously convicted of a crime involving

5    violence (§ 13-703(F)(2)), and that the murder of DeLao was especially cruel, heinous, or

6    depraved (§ 13-703(F)(6)).  (ROA 697; RT 4/2/93 at 21-31.)  At the hearing, Petitioner

7    elicited testimony from Deloney that in 1989 Petitioner's behavior became inappropriate, and

8    that she believed it was due to his use of crack cocaine.  (RT 10/30/92 at 45-46.)  Deloney

9    testified that, starting in July or August of 1989, Petitioner began using crack and became

10   violent and threatening towards her, and that, by the end of 1989, he was using crack on a

11   daily basis.   (RT 3/18/93 at 7-24.)   Petitioner's counsel renewed his motion for a

12   psychological evaluation based on Deloney's testimony regarding Petitioner's drug usage

13   and behavioral changes; the motion was denied.  (*Id.* at 48-49.)

14        <u>Clearly established law</u>

15        The Arizona Supreme Court denied this claim stating only that, "[u]nder the facts of

16   this case, we reject these claims."[6]  *Williams*, 183 Ariz. at 381, 904 P.2d at 450.  Because the

17   state court did not provide a rationale for its denial of the claim, this Court independently

18   reviews the record to assess whether the state court decision was objectively unreasonable

19   under controlling federal law.  *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.

20        The parties agree that the clearly established Supreme Court law governing this claim

21   is set forth in *Ake v. Oklahoma*.  According to *Ake*, due process requires the state to provide

22   an indigent defendant access to one competent psychiatrist when the defendant demonstrates

23   that "his sanity at the time of the offense is to be a significant factor at trial," or "when the

_____

25        [6]  Petitioner contends that the Arizona Supreme Court applied a state legal standard

26   to this claim, which was contrary to controlling federal law.  The Court disagrees.  The
     supreme court first assessed the relevant facts and analyzed Petitioner's related state law

27   claim under a state standard.  The court then noted that Petitioner was also asserting a due
     process claim and dismissed it summarily based on the facts set forth in the state law

28   analysis.

- 13 -

1   State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83.

2   Psychiatric testimony was critical for Ake at his sentencing because, to support a future

3   dangerousness aggravating factor, the State presented psychiatric testimony that he was a

4   continuing threat to society.  *Id.* at 84, 86.  The Supreme Court held that a psychiatrist is a

5   "basic tool of an adequate defense" when the defendant makes an adequate showing that

6   future dangerousness is a significant factor for his sentencing.  *Id.* at 77, 86.  A defendant's

7   mental condition is not at issue in every case, however; instead, the likely value of

8   psychiatric assistance is "at its height when the defendant's mental condition is seriously in

9   question."  *Id.* at 82.

10       Some circuit courts have found that the *Ake* holding is narrow and clearly requires

11  psychiatric assistance for sentencing only "when the state presents psychiatric evidence of

12  the defendant's future dangerousness."  *Mason v. Mitchell*, 320 F.3d 604, 615 (6th Cir.

13  2003); *Goodwin v. Johnson*, 132 F.3d 162, 188-89 (5th Cir. 1997) ("*Ake* only creates an

14  entitlement to the assistance of a psychiatrist during sentencing when the state offers

15  *psychiatric* evidence of the defendant's future dangerousness") (citing *Tuggle v. Netherland*,

16  516 U.S. 10, 12 (1995) (per curiam), and *Simmons v. South Carolina*, 512 U.S. 154, 164

17  (1994)); *but see Liles v. Saffle*, 945 F.2d 333, 341 (10th Cir. 1991) (finding psychiatric

18  assistance necessary because petitioner established mental condition as a significant factor

19  and state presented non-psychiatric evidence of future dangerousness).  In contrast, Petitioner

20  relies on a Ninth Circuit opinion in which the court found that the petitioner was entitled to

21  a psychiatric expert to prepare his mitigation claims, in light of his professed dissociative

22  state at the time of the crime, five-year drug addiction, and lack of propensity for violence.

23  *Smith v. McCormick*, 914 F.2d 1153, 1156 (9th Cir. 1990).

24       <u>Analysis</u>

25       As set forth above, there is not a clear consensus among the circuit courts regarding

26  the proper interpretation of *Ake* and whether it is to be extended beyond the specific

27  sentencing circumstances at issue in that case.  Thus, clearly established Supreme Court law

28  is limited strictly to the narrow holding in *Ake* – that a defendant is entitled to a mental health

1   professional for sentencing preparation only if the state presented psychiatric evidence of

2   future dangerousness. *See* 470 U.S. at 83.

3          The State did not allege future dangerousness as an aggravating factor as to Petitioner,

4   through psychiatric or other evidence, and presented no evidence in aggravation regarding

5   Petitioner's mental state.  Because the Supreme Court has never held that a defendant is

6   entitled to psychiatric assistance at sentencing in the circumstances alleged by Petitioner –

7   for general mitigation purposes rather than to rebut evidence of future dangerousness –

8   Petitioner cannot obtain relief on this claim. *See Williams*, 529 U.S. at 381 (relief precluded

9   if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

10  advanced by a petitioner); *Musladin*, 127 S. Ct. at 653-54.

11         Even if the Court accepted a more expansive interpretation of *Ake* as suggested in

12  *Smith*, it was not an unreasonable application of federal law to deny the claim.  As

13  emphasized in *Ake*, psychiatric assistance is most necessary and the risk of error without such

14  assistance is at its peak "when the defendant's mental condition is seriously in question."

15  470 U.S. at 82.  Petitioner had the burden of making a threshold showing to the trial court

16  that his mental condition was a "significant factor." *Id.* at 82-83.  The Arizona Supreme

17  Court made factual findings, based on the entire record, including Petitioner's representations

18  and trial testimony, that Petitioner's mental health was not in question and that he was not

19  intoxicated at the time he murdered DeLao. *Williams*, 183 Ariz. at 381, 904 P.2d at 450.  As

20  Petitioner points out, there was testimony at trial by Deloney that Petitioner told her he had

21  been doing cocaine with DeLao on the Saturday before her murder;[7] however, Petitioner's

22  testimony was in direct contradiction.   Again, at sentencing Deloney testified about

23  Petitioner's cocaine use in general, but not as to the specific day of the murder.  (RT

24  10/30/92 at 40-46; RT 3/18/93 at 7-24.)  The supreme court's findings are not objectively

25

26         [7]   Contrary to Petitioner's suggestion (Dkt. 44 at 14 n.2), Troy Pool and Linda
    Medrano did not testify before the jury to drug use by Petitioner (RT 5/22/92 at 4-37; RT
27  5/27/92 at 5-44), nor did any other witness besides Deloney.  However, the prosecutor
    represented to the trial court that several witnesses had knowledge of Petitioner's extensive
28  drug use.  (RT 1/23/92 at 36.)

1    unreasonable in light of the record and Petitioner does not allege clear and convincing

2    evidence to overcome them; therefore, this Court must take those findings as true. 28 U.S.C.

3    § 2254(d)(2) & (e)(1). In light of those findings, Petitioner's allegations did not satisfy the

4    threshold showing that his mental state was a significant factor for sentencing. This contrasts

5    with the *Smith* case because Smith testified that he was a long-time addict, and he and a

6    friend testified that he was hallucinating at the time of the crimes. *Smith*, 914 F.2d at 1156.

7    Because Petitioner did not demonstrate that his mental condition was a significant factor and

8    the state produced no psychological evidence which needed to be rebutted by the testimony

9    of a defense expert, the Arizona Supreme Court's decision to deny Petitioner's *Ake* claim was

10   not an objectively unreasonable application of federal law. Therefore, Petitioner is not

11   entitled to habeas relief on Claim 8.

12       Finally, an *Ake* claim is based on the evidence that was before the trial court. *See* 470

13   U.S. at 83 (examining the showing made to the trial judge establishing the need for

14   psychiatric assistance); *Goodwin*, 132 F.3d at 189. Therefore, neither factual development

15   nor an evidentiary hearing is necessary to this claim's resolution. *See Hendricks v. Vasquez*,

16   974 F.2d 1099, 1103 (9th Cir.1992) (stating that no evidentiary hearing is required if "there

17   are no disputed facts and the claim presents a purely legal question").

18       **Claim 9**

19       Petitioner alleges that the trial court violated his rights to due process and to be free

20   from cruel and unusual punishment when it considered the opinions of the victim's family

21   members as to the appropriate sentence. Specifically, Petitioner argues that his rights were

22   violated when the court considered the opinion of DeLao's father that Petitioner should be

23   sentenced to death.

24       Background

25       A victim questionnaire from Soto was filed with the court in which she explained the

26   impact of the crime on her life and expressed the opinion that Petitioner should be sentenced

27   to death. (ROA 617.) The Presentence Report (PSR) summarized Soto's victim impact

28   statement, and also discussed how DeLao's murder emotionally and financially impacted

1   DeLao's mother, father, and son.  (ROA 624 at 6-7.)  Additionally, the PSR provided the

2   following input from the victims regarding the sentence they believed to be appropriate:

3           CR-15716 [attempted murder of Soto]:  Ms. Soto states that the
        defendant should receive the death penalty for her [sic] offense, as well as the
4       murder of Rita Delao due to the pain and suffering he has caused.

5           CR-16291 [murder of DeLao]: Bruno Delao asks that the Court impose
        the death penalty, stating that the defendant has killed the entire family, not
6       just his daughter.

7   (ROA 624.)

8           At the aggravation/mitigation hearing, the court remarked, with respect to the victims,

9   that "everybody has had an opportunity to put in written statements, and they are in the court

10  file and will be considered as required by law under the Victims' Rights Law."  (RT 3/18/93

11  at 62.)  The court explained to Soto that she was "the victim on the portion of the case where

12  the death penalty is not involved."  (*Id.* at 64.)  At the time of sentencing, the judge stated,

13  "I have had the opportunity of reviewing the presentence report . . . . The victims have

14  previously appeared and made their statements known to the Court."  (RT 4/7/93 at 5.)

15  When entering the sentence on the first degree murder charge, the judge stated that the

16  sentence was "[b]ased on the evidence introduced at trial, the evidence received at the

17  sentencing hearing, and the presentence report."  (*Id.* at 9.)

18          At the time of Petitioner's sentencing, Arizona law provided that victims could submit

19  written impact statements or provide an oral statement for the probation officer's use in

20  preparing the PSR.  A.R.S. § 13-4424.  Further, victims could offer opinions regarding "the

21  criminal offense, the defendant, the sentence or the need for restitution at any aggravation,

22  mitigation, presentencing or sentencing proceeding."  A.R.S. § 13-4426.

23          <u>Clearly Established Law</u>

24          In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

25  introduction of a victim impact statement during the sentencing phase of a capital case

26  violated the Eighth Amendment.  In *Payne v. Tennessee*, 501 U.S. 808, 825, 827 (1991), the

27  Supreme Court overruled *Booth*, in part, by holding that the Eighth Amendment does not

28  erect a *per se* barrier to the admission of all victim impact evidence.  However, the *Payne*

1    ruling retains *Booth*'s prohibition on admitting characterizations and opinions from the

2    victim's family about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

3          Analysis

4          The Court finds that the Arizona Supreme Court's denial of this claim was neither

5    contrary to nor an unreasonable application of *Booth* and *Payne*.  Petitioner was sentenced

6    by a judge, not a jury, and "[t]rial judges are presumed to know the law and to apply it in

7    making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overturned on other*

8    *grounds by Ring v. Arizona*, 536 U.S. 584 (2002).  Thus, although the Arizona Victims'

9    Rights Law required that a victim be allowed to present an opinion regarding sentence, it did

10   not override the judge's constitutional obligation not to consider that input.  *See* A.R.S.

11   §§ 13-4424, 13-4426.  When victim statements include impact evidence and a sentencing

12   recommendation, "in the absence of any evidence to the contrary, [the Court] must assume

13   that the trial judge properly applied the law and considered only the evidence he knew to be

14   admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) (citing *Walton*, 497

15   U.S. at 653).

16         Because there is no evidence to the contrary, this court must assume the sentencing

17   judge properly applied *Booth* and *Payne* and did not consider the sentencing

18   recommendations of the victims.  Because Arizona law allowed the victims to submit, and

19   state and federal law allowed the judge to consider, victim impact evidence, it was proper for

20   the court to note that he would consider the victim statements within the boundaries of the

21   law.[8]  The judge's silence regarding the sentencing recommendation of DeLao's father does

22   not amount to "contrary evidence," particularly because the recommendation was given in

23   writing and not in open court where clarification from the judge might be expected.  For

24   example, when Soto made a statement at the presentence hearing, the judge made a point of

25   

26         [8]   Petitioner's argument glosses over the fact that the sentencing judge was
     constitutionally permitted to consider the victim impact statements.  Rather, he presumes the
27   judge's statements that he had received and would consider victim statements referred to the
     one sentencing recommendation at issue rather than to the other properly considered victim
28   impact evidence.  This presumption is contrary to the law set forth above.

1   clarifying that Soto's sentencing opinion was not relevant to the capital crime (RT 3/18/93

2   at 64); similarly, because Petitioner had specifically raised it, the court found on the record

3   that DeLao's sister's support for a life sentence was not a relevant mitigating circumstance

4   (RT 4/7/93 at 14).

5        Finally, the Arizona Supreme Court conducted an independent review of Petitioner's

6   sentence, noting that victims' sentencing recommendations are not relevant, and concluded

7   that the death penalty was appropriate. *Williams*, 183 Ariz. at 386, 904 P.2d at 455. Thus,

8   any error by the trial court was harmless. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754

9   (1990) (holding that appellate courts are constitutionally permitted to affirm a death sentence

10  based on independent re-weighing despite any error at sentencing). The Arizona Supreme

11  Court's denial of this claim was not contrary to nor an unreasonable application of federal

12  law. Petitioner is not entitled to relief on this claim and it is denied.

13       **Claim 10**

14       Petitioner alleges several constitutional violations based upon the state courts'

15  application of aggravating factors to his sentence. He contends that the (F)(2) aggravating

16  factor is vague, overbroad, arbitrary and capricious; that there was insufficient evidence to

17  support the (F)(6) aggravating factor; and that the Arizona Supreme Court erroneously failed

18  to remand for a new sentencing or reweigh the aggravation and mitigation.

19       (F)(2) Aggravating Factor

20       The trial court found the (F)(2) aggravating factor – that Petitioner was "previously

21  convicted of a felony in the United States involving the use or threat of violence" – based on

22  the attempted murder and armed robbery of Soto. A.R.S. § 13-703-(F)(2). The Arizona

23  Supreme Court found that the (F)(2) factor was supported only by the armed robbery, not the

24  attempted murder. *Williams*, 183 Ariz. at 382, 904 P.2d at 451. Petitioner argues that the

25  Arizona Supreme Court's interpretation of the (F)(2) factor and its application to his case was

26  vague, arbitrary and capricious because the robbery occurred after the capital murder; thus,

27  he contends, it was the result of a subjective decision by the judge that the judgment on the

28  robbery was entered prior to the capital sentence and available to satisfy the requirements of

1   the (F)(2) circumstance.

2        The crux of Petitioner's argument is a disagreement with how the Arizona Supreme

3   Court has interpreted the statutory language of the (F)(2) factor.  However, if a state court

4   has defined a statutory factor, the federal court's role is to limited to determining "whether

5   those definitions are constitutionally sufficient, i.e., whether they provide some guidance to

6   the sentencer."  *Walton*, 497 U.S. at 654.  The Arizona Supreme Court has consistently

7   interpreted the (F)(2) factor to apply to any convictions entered prior to the capital sentencing

8   hearing, regardless of the timing of that crime or conviction in relation to the capital crime.

9   *See State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983); *State v. Lee*, 189 Ariz.

10  590, 604, 944 P.2d 1204, 1218 (1997) (noting that (F)(2) applies to simultaneous

11  convictions).  Under Arizona law, a conviction is "entered" at the time guilt is determined,

12  not at the time of judgment and sentencing.[9]  *See State v. Walden*, 183 Ariz. 595, 615-16 &

13  n.8, 905 P.2d 974, 994-95 & n.8 (1995), *overruled on other grounds by State v. Ives*, 187

14  Ariz. 102, 108, 927 P.2d 762, 768 (1996).

15       The state court applied that interpretation to Petitioner's case.  *See Williams*, 183 Ariz.

16  at 382-83, 904 P.2d at 451-52.  The interpretation provides clear guidance, is not vague, and

17  does not allow for arbitrary imposition of the (F)(2) factor.  *See Walton*, 497 U.S. at 655

18

19          [9]  Contrary to Petitioner's contention, there is nothing nonsensical about Arizona's
20  interpretation of the (F)(2) statutory language.  Although convictions may be entered
    simultaneously for a death-eligible offense and a separate felony using or threatening
21  violence, the capital sentencing proceeding does not occur simultaneously with those
22  convictions.  Thus, at the subsequent capital sentencing, a conviction entered simultaneously
    with the death-eligible murder conviction satisfies the common understanding of the terms
23  "previously convicted," whether or not judgment and sentence on the non-capital offense
24  have been imposed.  This interpretation is rational, as explained by the Arizona Supreme
    Court, because "[t]he purpose of the aggravation/mitigation hearing is to determine the
25  character and propensities of the defendant.  That a defendant has been found guilty of
26  another offense . . . is directly relevant to this determination, whether judgement has entered
    or not."  *State v. Walden*, 183 Ariz. 595, 616, 905 P.2d 974, 995 (1995) (citations omitted).
27  Considering a person's entire criminal history up to the point of sentencing is a principled
28  means to distinguish those that receive the death penalty.  *Cf. Maynard v. Cartwright*, 486
    U.S. 356, 362 (1988).

1   (concluding that if a state court interpretation of the aggravating factor furnishes sufficient

2   guidance it satisfies the requirement that the death sentence not be wantonly and freakishly

3   imposed).  The definition establishes a bright line test, applying to all felony convictions

4   using or threatening violence that have been entered at the time of a capital sentencing.  This

5   satisfies the constitutional requirements applicable to aggravating circumstances.  *See*

6   *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (holding that aggravating factors must

7   apply only to a subclass of defendants convicted of murder and may not be unconstitutionally

8   vague).  Petitioner is not entitled to relief on this portion of Claim 10.

9       (F)(6) Aggravating Factor

10       Petitioner contends the (F)(6) factor was not supported by sufficient evidence.  The

11   trial court based its (F)(6) finding on the crime being heinous and depraved due to mutilation,

12   gratuitous violence, and the victim's helplessness.  The Arizona Supreme Court upheld the

13   (F)(6) factor based on gratuitous violence and helplessness of the victim.  *Williams*, 183 Ariz.

14   at 383, 904 P.2d at 452.  In support of these findings, the court cited the following evidence:

15       Rita's body was broken, crushed, torn, scraped, shot, dragged, beaten, and
        bruised.  In addition to being shot three times, Rita suffered a savage beating
16       with a hard object, resulting in blunt force injuries covering virtually her entire
        upper body.  Her internal injuries, consisting of pierced and torn organs, were
17       numerous and severe.  One of the gunshots completely fractured Rita's right
        femur, her ribs were fractured in at least thirty-one places and she suffered a
18       broken nose, a fractured breast bone, fractured collar bones, and massive
        fractures of the pelvic bone.  She was run over by an automobile at least twice.
19       The number and nature of Rita's injuries belie any claim that defendant did not
        inflict violence in excess of that necessary to kill. . . .
20
        After being shot and beaten, she was unable to defend herself against
21       defendant's further attack.  When defendant dragged Rita by her feet into the
        road, Rita was still alive, but unable to move.   She may have been
22       unconscious.  Her right leg was completely disabled as a result of the broken
        femur.  Thus, she was totally helpless.
23
24   *Id.*  To assess the sufficiency of the evidence, the Court applies the "rational factfinder"

25   standard; i.e., "whether, after viewing the evidence in the light most favorable to the

26   prosecution, any rational trier of fact could have found" the aggravating factor to exist.

27   *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

28   (1979)).

- 21 -

1    Under Arizona law, a murder involves gratuitous violence if it involves violence
2  "beyond that necessary to kill." *State v. Amaya-Ruiz*, 166 Ariz. 152, 178, 800 P.2d 1260,
3  1286 (1990) (numerous stab wounds and gunshot wound to the head constituted gratuitous
4  violence). Petitioner contends that the victim was alive at the time she was run over by a car,
5  which ultimately caused her death. Thus, he argues that, although she suffered multiple
6  injuries, each act of violence was intended to subdue or kill the victim and was not
7  gratuitous. The Court disagrees. The multiple injuries indicate significant violent acts
8  against the victim that were not necessarily intended to cause, or related to the actual means
9  of, death, suggesting the acts were gratuitous. *Cf. State v. Jones*, 205 Ariz. 445, 449, ¶ 16,
10 72 P.2d 1264, 1268 (2003) (noting gratuitous violence may not be established if the
11 "majority of injuries result from the means used to inflict death") (citing *State v. Schackart*,
12 190 Ariz. 238, 249, 947 P.2d 315, 326 (1997)). The facts of this case fit squarely within
13 other gratuitous violence cases in Arizona; therefore, the Court concludes that a rational trier
14 of fact could have found gratuitous violence in this case.

15    Under Arizona law, a victim is helpless when she is physically unable to resist the
16 murder or summon aid. *State v. Murray*, 184 Ariz. 9, 38, 906 P.2d 542, 571 (1995); *State
17 v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992). Petitioner does not appear to
18 contest the helplessness finding and the Court concludes that a rational trier of fact could
19 easily find that the victim was helpless beyond a reasonable doubt.

20    A rational trier of fact could have found the (F)(6) aggravating factor; therefore,
21 Petitioner is not entitled to relief on this portion of Claim 10.

22        <u>Reweighing of Aggravation and Mitigation</u>

23    Petitioner alleges that, after the Arizona Supreme Court determined that attempted
24 murder was not a crime of violence for purposes of the (F)(2) factor and upheld the (F)(6)
25 heinous and depraved factor without discussing the trial court's finding of mutilation, it
26 should have remanded for a resentencing or reweighed the aggravation and mitigation.

27    Petitioner's argument is premised on the requirement that an appellate court must
28 conduct harmless-error review, reweigh, or remand in cases where the sentencing court

included an invalid aggravating factor in the sentencing equation. *See Richmond v. Lewis*, 506 U.S. 40, 48-49 (1992); *Stringer v. Black*, 503 U.S. 222, 230-31 (1992); *Clemons v. Mississippi*, 494 U.S. 738 (1990). Petitioner's reliance on this principle is misplaced because the Arizona Supreme Court did not find invalid either of the aggravating factors applied by the sentencing court. Rather, the Arizona Supreme Court found that the (F)(2) factor was supported by Petitioner's armed robbery conviction, although not the attempted murder conviction, and that the (F)(6) factor was supported by gratuitous violence and helplessness, although it did not review the finding of mutilation. Petitioner points to no law, and the Court is not aware of any clearly established Supreme Court precedent, requiring a reweighing when an appellate court invalidates or does not discuss some of the factual support for a particular aggravating factor but upholds the factor itself. Therefore, Petitioner cannot obtain relief on this portion of Claim 10. *See Williams*, 529 U.S. at 381 (relief precluded if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner); *Musladin*, 127 S. Ct. at 653-54.

Further, pursuant to statute and relevant case law, the Arizona Supreme Court was required to "reweigh" in Petitioner's case based on its independent review of the trial court's aggravation and mitigation findings. *See* A.R.S. § 13-703.01(A) (West 1994); *Lee*, 189 Ariz. at 617-18, 944 P.2d at 1231-32 (noting that in death sentence appeals, after independent review of aggravation and mitigation, the court "weigh[s] the aggravating and mitigating circumstances"); *State v. Barreras*, 181 Ariz. 516, 520-21, 892 P.2d 852, 856-57 (1995) (citing § 13-703.01 as requiring a "weighing" of aggravation and mitigation to determine if a death sentence is proper). The statute explicitly provides that, to the extent the court "determines that an error was made regarding a finding of aggravation or mitigation, the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation." A.R.S. § 13-703.01(B). The Arizona Supreme Court independently reviewed Petitioner's sentence, which necessarily involved a weighing of the aggravation and mitigation as found by that court upon its independent review of Petitioner's sentence. *Williams*, 183 Ariz. at 382-86, 904

P.2d at 451-55.  Because the court conducted a "reweighing," there is no factual support for Petitioner's claim.

For the reasons discussed above, Petitioner is not entitled to relief on this portion of Claim 10.  Claim 10 is therefore denied.

**Claim 11 (in part)**

Petitioner alleges that the state courts violated his Eighth and Fourteenth Amendment rights by failing to consider his drug addiction as a mitigating circumstance.  With respect to non-statutory mitigating circumstances, the sentencing court stated that Petitioner "has . . . presented and [the court] has considered" several factors, including:

> 3.   Defendant's cocaine and drug usage over a prolonged period of time may have been a contributing factor in his behavioral changes during 1989, but which the Court does not find to be a relevant mitigating circumstance.  There was no evidence introduced at trial, including the defendant's own testimony, to indicate that cocaine usage by the defendant was a factor in the preparation of the murder.

(RT 4/7/93 at 13.)  The Arizona Supreme Court reviewed Petitioner's assertion of drug use as a mitigating factor but found that it was not mitigating, in particular because Petitioner did not contend or prove that he was impaired at the time of the murder.  *Williams*, 183 Ariz. at 384, 904 P.2d at 453.  This Court addresses separately the two types of mitigation Petitioner asserts regarding this claim, drug use/impairment at the time of the murder and ongoing drug addiction.

As an initial matter, Petitioner disputes the state court factual finding that Petitioner was not under the influence of drugs at the time of the murder.  However, this finding is not objectively unreasonable in light of the record – i.e., the testimony of one witness who stated that Petitioner told her he had been doing cocaine on the Saturday before the murder (RT 5/21/92 at 72-73), an assertion which Petitioner expressly denied during his testimony (RT 6/18/92 at 153).  This Court must defer to the state court finding unless Petitioner overcomes it by clear and convincing evidence, a standard which he does not contend he can meet.  *See* 28 U.S.C. § 2254(e)(1).  In light of the state court's factual determination, it was not error to find that drug impairment at the time of the crime was not a relevant mitigating

1   circumstances in Petitioner's case.  Further, the state courts considered Petitioner's alleged

2   drug use at the time of the crime, which is all that is required.  *See Eddings v. Oklahoma*, 455

3   U.S. 104, 114-15 (1982) (evidence must be considered but the sentencer determines the

4   weight it is to be accorded); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Ortiz v. Stewart*, 149

5   F.3d 923, 943 (9th Cir. 1998).

6          Similarly, the record is clear that the trial court and the Arizona Supreme Court

7   considered Petitioner's ongoing drug use/addiction as potential mitigation.  *See Eddings*, 455

8   U.S. at 114-15; *Lockett*, 438 U.S. at 604; *Ortiz*, 149 F.3d at 943.  Petitioner appears to

9   contend that the Arizona courts were obligated to find that his ongoing drug use was a

10  mitigating factor.  The Constitution does not require such a finding.  To the contrary, there

11  is a clear distinction between "a failure to consider relevant evidence and a conclusion that

12  such evidence was not mitigating"; the latter determination does not implicate the

13  Constitution.  *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).

14         The Arizona Supreme Court's denial of this claim was not contrary to or an

15  unreasonable application of clearly established Supreme Court law.  Additionally, the claim

16  as presented by Petitioner – i.e., alleging that the state courts failed to consider evidence

17  presented by Petitioner – must be resolved based solely on the information presented to the

18  trial court at, or prior to, sentencing as set forth in the state court record.  Therefore, an

19  evidentiary hearing is not warranted.  *See Vasquez*, 974 F.2d at 1103.  Claim 11 is denied.

20         **Claim 12**

21         Petitioner alleges that the Arizona death penalty statute is unconstitutional because

22  it fails to narrow the class of persons eligible for the death sentence. The Arizona Supreme

23  Court summarily denied this claim, citing *Walton*, 497 U.S. at 652-56, and *Gregg v. Georgia*,

24  428 U.S. 153, 169-87 (1976).  This decision was neither contrary to nor an unreasonable

25  application of clearly established federal law.

26         In *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court held

27  the death penalty statutes of Georgia and Texas to be unconstitutional because they allowed

28  arbitrary and unguided imposition of capital punishment.  In response to *Furman*, many

states enacted new capital statutes.  A number of these statutes survived the Court's further

scrutiny in *Gregg*, where the Court, observing that the death penalty is "unique in its severity

and irrevocability," concluded that a death sentence may not be imposed unless the

sentencing authority focuses its attention "on the particularized nature of the crime and the

particularized characteristics of the individual defendant."  428 U.S. at 187, 206.  Pursuant

to *Gregg*, therefore, in imposing the death sentence the sentencer must find the presence of

at least one aggravating factor and then weigh that factor against the evidence of mitigating

factors.  *Id.* at 206.  Subsequently, in *Zant v. Stephens*, the Court refined these general

requirements, holding that a constitutionally valid capital sentencing scheme must "genuinely

narrow the class of persons eligible for the death penalty and must reasonably justify the

imposition of a more severe sentence on the defendant compared to others found guilty of

murder."  462 U.S. 862, 877 (1983).  The Court explained that a death penalty scheme must

provide an "objective, evenhanded and substantively rational way" for determining whether

a defendant is eligible for the death penalty.  *Id.* at 879.

In addition to the requirements for determining eligibility for the death penalty, the

Court has imposed a separate requirement for the selection decision, "where the sentencer

determines whether a defendant eligible for the death penalty should in fact receive that

sentence."  *Tuilaepa*, 512 U.S. at 972.  "What is important at the selection stage is an

individualized determination on the basis of the character of the individual and the

circumstances of the crime."  *Zant*, 462 U.S. at 879.  Accordingly, a statute that "provides

for categorical narrowing at the definition stage, and for individualized determination and

appellate review at the selection stage" will ordinarily satisfy Eighth Amendment and Due

Process concerns, *id.*, so long as a state ensures "that the process is neutral and principled so

as to guard against bias or caprice."  *Tuilaepa*, 512 U.S. at 973.

The Court has explained that defining specific "aggravating circumstances" is the

accepted "means of genuinely narrowing the class of death-eligible persons and thereby

channeling the [sentencing authority's] discretion."  *Lowenfield v. Phelps*, 484 U.S. 231, 244

(1988).  Each aggravating circumstance must meet two requirements.  First, "the

1   circumstance may not apply to every defendant convicted of a murder; it must apply only to

2   a subclass of defendants convicted of murder." *Tuilaepa*, 512 U.S. at 972; *see Arave v.*

3   *Creech*, 507 U.S. 463, 474 (1993).  Second, "the aggravating circumstance may not be

4   unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972; *see Arave*, 507 U.S. at 473; *Godfrey*

5   *v. Georgia*, 446 U.S. 420, 428 (1980).

6           Arizona's death penalty scheme allows only certain, statutorily defined, aggravating

7   circumstances to be considered in determining eligibility for the death penalty.  A.R.S. § 13-

8   703(F).  As the Supreme Court has noted, "The presence of aggravating circumstances serves

9   the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment

10   does not require that these aggravating circumstances be further refined or weighed by [the

11   sentencer]." *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990).  Moreover, not only

12   does Arizona's sentencing scheme generally narrow the class of death-eligible persons, but

13   the aggravating factors found as to Petitioner, § 13-703(F)(2) and (6), do so specifically.

14           The Ninth Circuit and the United States Supreme Court have upheld Arizona's death

15   penalty statute against allegations that particular aggravating factors – including those which

16   Petitioner specifically targets in support of this claim – do not adequately narrow the

17   sentencer's discretion.  *See Jeffers*, 497 U.S. at 774-77 (addressing the (F)(6) factor); *Walton*,

18   497 U.S. at 649-56 (same); *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996)

19   (addressing the (F)(5) factor).  The Ninth Circuit has also explicitly rejected the argument

20   that Arizona's death penalty statute is unconstitutional because it "does not properly narrow

21   the class of death penalty recipients." *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

22           Petitioner also contends that Arizona's first degree murder statute allows for

23   conviction and, thus, death eligibility, even if a person does not kill or intend to kill.

24   Regardless of the statute, the Constitutional mandate for death eligibility is that a person must

25   have actually killed, attempted to kill, intended to kill, or acted as a major participant with

26   reckless indifference to human life.  *See Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v.*

27   *Arizona*, 481 U.S. 137 (1987).  In compliance with this requirement, the sentencing court

28   made an explicit finding that Petitioner killed DeLao. (RT 4/7/93 at 16.)  Finally, Petitioner

1    also faults the Arizona system for its lack of proportionality review. The Supreme Court has

2    explicitly held that the constitution does not require a proportionality review. *Walton*, 497

3    U.S. at 655-56.

4         For the reasons discussed above, Petitioner is not entitled to relief on this claim.

5    **Claim 13**

6         Petitioner alleges that the death penalty is unconstitutional because it violates evolving

7    standards of decency. The Arizona Supreme Court summarily rejected this claim. *Williams*,

8    183 Ariz. at 386, 904 P.2d at 455. The Supreme Court holds that "the punishment of death

9    does not invariably violate the Constitution." *Gregg*, 428 U.S. at 169; *see also Roper v.*

10   *Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when

11   applied to a narrow category of crimes and offenders). Because there is no clearly

12   established Supreme Court law supporting Petitioner's contention, he cannot obtain relief on

13   this claim. *See Williams*, 529 U.S. at 381; *Musladin*, 127 S. Ct. at 653-54. Claim 13 is

14   denied.

15   **Claim 16**

16        Petitioner alleges the state violated his right to a fair trial by withholding exculpatory

17   evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, he contends

18   that the State possessed information that someone else may have murdered DeLao.

19        Claim 16 was added by way of amendment after exhaustion in a successive post-

20   conviction relief proceeding in state court. (Dkts. 81, 108.) Because the state court did not

21   address this claim on the merits (*see* Dkt. 78, Ex. A), the Court reviews it de novo. *See*

22   *Pirtle*, 313 F.3d at 1167. The Court granted discovery regarding Claim 16 and an evidentiary

23   hearing through the receipt of written evidence (Dkt. 108); discovery and the submission of

24   evidence have been completed.[10]

25

26   ───────────────

27        [10] In a January 17, 2007 filing, Petitioner's counsel asserted that they were still
     attempting to locate one witness and would inform the Court if additional material evidence

28   was developed from that witness's interview. (Dkt. 118 at 2 n.1.) Counsel stated that they
     received the last of Respondents' discovery disclosures in mid-September 2006. (*See id.* at

1        Governing Law

2        A successful *Brady* claim requires three findings:  (1) the prosecution suppressed

3  evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material

4  to the issue of guilt or punishment.  *Brady*, 373 U.S. at 87.  Evidence is material "if there is

5  a reasonable probability that, had the evidence been disclosed to the defense, the result of the

6  proceeding would have been different.  A 'reasonable probability' is a probability sufficient

7  to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682

8  (1985); *see also Harris v. Vasquez*, 949 F.2d 1497, 1528 (9th Cir. 1990).  The question is

9  whether the defendant received a fair trial in the absence of the suppressed evidence, not

10 whether it is more likely than not that the defendant would have been acquitted if the

11 evidence had been disclosed.  *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

12       Summary of Evidence

13       In a September 3, 1997 letter to Petitioner's post-conviction counsel, Assistant

14 Attorney General Dawn Northup stated that she was enclosing letters recently found at the

15 Pinal County Attorney's office.  (Dkt. 109, Ex. A at 1.)[11]  Ms. Northup represented that

16 neither the prosecutor nor the detective to whom most were addressed, Thomas Solis,

17 recalled receiving or seeing the letters previously.  (*Id.*)  All seven of the letters were written

18 and sent by Beverly Sweat while she was in custody at the Pinal County Jail.

19       The initial letter, dated May 3, 1991, was sent to the "Pinal County Sheriff Office,

20 attn: homicide, attn: detectives or investigators" and addressed "to whom this may concern.

21 " (*Id.* at 2.)  In the letter, Sweat stated that she had information concerning a murder that was

22 going to trial soon and that she was willing to exchange the information for early release and

23 an outpatient drug program.  (*Id.*)  Between May 7 and June 7, 1991, Sweat wrote six more

24 letters addressed to the Pinal County Sheriff, attention Thomas Solis.  (*Id.* at 8, 10, 13, 16,

25 18.)

26

27 2.)  To date, no additional material has been provided to the Court.

28       [11]  More legible copies of the letters are attached to the answer (*see* Dkt. 93).

1      Two letters were dated May 7, 1991.  (*Id.* at 4, 6.)  In the first, Sweat wrote that, "I'm

2  going to get Yolanda to tell me the story about Rita and Patrick Fields."  (*Id.* at 5.)  She also

3  suggested that Solis try to question Milton Barnette Jr., because his name had been

4  mentioned by Yolanda and "Aaron" was repeatedly asking questions about him.  (*Id.*)

5  Further, she wrote that "Aaron . . . said there was [sic] two people he was going to get one

6  from Eloy →Patrick Fields one from Casa Grande Milton Barnette."  (*Id.*)  In the second

7  letter, Sweat said that Yolanda had told her what happened the night Rita was killed.  (*Id.* at

8  6.)  According to Sweat, Yolanda said that she was walking down Trekkle Road in Casa

9  Grande and saw Patrick, who was all bloody and had a knife on him; he said that he had just

10  killed Rita, that "Aaron" had paid him $1000.00, and that he (Patrick) cut out her eyes and

11  used a moped to run her over.  (*Id.*)  According to Sweat, Yolanda said that she and Patrick

12  burned the clothes he was wearing and spent the money.  (*Id.*)  She goes on to say, "I know

13  Aaron is guilty of some part of it."  (*Id.*)

14      In the fourth letter, Sweat asked Solis to tell the County Attorney that she would do

15  "whatever" to help him.  (*Id.* at 9.)  In the fifth, Sweat stated that she had her sister call Solis

16  and that her sister had told her that once Solis contacted the county attorney he could work

17  on getting her out of jail.  (*Id.* at 11.)  She asked Solis to get her out and stated that she

18  believed she could provide more help regarding Rita's case if she was out and that she would

19  try her best to find out what happened.  (*Id.*)  In the sixth letter, Sweat stated that Yolanda

20  was going to court on June 10, 1991, and might be released, that Solis should talk to her right

21  away, and that Patrick Fields was back in custody but that she could find out more if she was

22  released because the trial was coming up.  (*Id.* at 14-15.)  In the final letter, Sweat wrote to

23  Solis that "you told me if I helped you, you would help me . . . I would just like to know if

24  the agreement is still on."  (*Id.* at 17.)  She stated there was more than one way she was

25  willing to help the county attorney.  (*Id.*)

26      Petitioner developed and filed with his third amended petition additional evidence

27  based on these letters, including a March 30, 1999 declaration from Yolanda McKaney.  (*Id.*,

28  Ex. H.)  McKaney declares that in early 1990, around the time of DeLao's death, she was in

1    Casa Grande in the area of the park near Trekkle Road and Florence Boulevard.  (*Id.*, ¶ 2.)

2    She observed Patrick Fields come into a nearby alley with blood all over his shirt, which he

3    took off, threw into a dumpster and burned.  (*Id.*, ¶¶ 3-4.)  Further, she declared that Milton

4    Barnett was in the area at the time.  (*Id.*, ¶ 6.)  Petitioner also submitted an April 2, 1999

5    declaration from Milton Barnett Jr.  (*Id.*, Ex. I.)  Barnett declared that in January 1990, he

6    was on his way home from the park by Second Street in Casa Grande just as the sun was

7    coming up.  (*Id.*, ¶ 1.)  As he passed down an alley he saw Patrick Fields, bare-chested and

8    upset, leaning over a dumpster and throwing in something that he had rolled up in his hand.

9    (*Id.*, ¶ 2.)  He and Fields left to go smoke, and when Fields pulled a pipe out of his pocket,

10   Barnett noticed blood on his pants and shoes.  (*Id.*, ¶¶ 3-4, 6.)  Barnett asked Fields what he

11   had done, and Fields threw down the pipe and ran away.  (*Id.*, ¶ 7.)  The next day Barnett

12   heard that DeLao had been killed.  (*Id.*, ¶ 8.)  Petitioner also filed an April 7, 1999

13   declaration from Fields in which he stated that he heard rumors that he had killed DeLao but

14   that it was not possible for him to have done so because he was in the Pinal County Jail at

15   the time.  (*Id.*, Ex. J.)  However, pursuant to this Court's Order, Respondents provided

16   documentation that Fields was not in custody at the time of DeLao's murder.  (*See* Dkt. 116,

17   Ex. A.)

18        Additionally, Petitioner filed a declaration from Dennis Gray, Petitioner's trial

19   counsel, who states that he presented an innocence defense at trial but did not have an

20   alternative suspect for DeLao's murder to present to the jury. (Dkt. 118, Ex. C.)  He declares

21   that he did not know from Petitioner or anyone else that Beverly Sweat, Yolanda McKaney,

22   or Milton Barnett Jr. might possess exculpatory information or that Patrick Fields might have

23   been a suspect in the murder of DeLao; he states that he first heard this information from

24   habeas counsel.  (*Id.*)

25        Analysis

26        The Court focuses its analysis on the materiality of the evidence at issue; because that

27   issue is dispositive, the Court need not consider the other two *Brady* criteria.  To assess

28   materiality, the Court must determine whether "there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Because inadmissable evidence cannot be presented to a jury and, therefore, cannot impact the result of the proceeding, evidence is not material under *Brady* if it is not admissible. *See United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989); *Brady*, 373 U.S. at 89-90. Petitioner does not dispute Respondents' contention that Sweat's letters themselves are not admissible and do not meet any hearsay exception; rather, he argues that if the letters had been disclosed the defense would have known of three potential witnesses: McKaney, Barnett, and Fields. Thus, the Court focuses solely on the admissible evidence Petitioner has developed from these witnesses, not the content of the letters.[12]

McKaney's declaration asserts that she saw Fields disposing of his bloody shirt in an alley dumpster, "[i]n early 1990, around the time of the death of" DeLao.[13] Barnett's declaration states, in sum, that around dawn on a day in January 1990 he saw Fields dispose of something in an alley dumpster and that Fields was upset, shirtless, and had blood on his

---

[12] The parties dispute whether, prior to or at the time of trial, Petitioner already had sufficient knowledge that would have allowed him to investigate any exculpatory evidence available from these witnesses, which would undercut his suppression argument. *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (finding no *Brady* violation if defendant already possessed the basic facts contained in the allegedly exculpatory material). Respondents contend that the assertions in the letters that Petitioner was out to "get" Fields and Barnett and that Petitioner paid Fields to kill DeLao, as well as Fields's report of rumors that he had killed DeLao, suggest that Petitioner knew of these potential witnesses. Petitioner alleges, although not in a sworn filing, that the people he was out to get were men that had attacked his long-time friend Connie Silas. (*See* Dkt. 118, Exs. A, B (declaration from Silas and her brother verifying that Silas was attacked in 1990 by local men who were never found).) Although Petitioner did not file his own declaration averring that he was unaware of these witnesses, he did file a declaration from counsel to that effect (*id.*, Ex. C). Because the Court resolves this claim based on materiality, it does not reach the dispute over Petitioner's prior knowledge.

[13] Petitioner also advances the possibility that McKaney would testify that Fields confessed to killing DeLao. This suggestion is wholly unsupported by her declaration, which does not reference a confession; to the contrary, McKaney crossed out a paragraph of the prepared declaration which stated that she wondered if Fields killed DeLao. (Dkt. 109, Ex. H, ¶ 5.)

1    pants and shoes; the following day Barnett heard that DeLao had been killed.  Fields's

2    declaration states that he could not have killed DeLao because he was in jail; Respondents

3    have established that he was not in custody at that time.[14]  In sum, the admissible evidence

4    developed since trial indicates that witnesses would testify that in proximity to the day

5    DeLao was killed, Fields was seen in the early morning hours in Casa Grande, the city in

6    which DeLao's car was found; that he had blood on his clothes and shoes; and that he

7    disposed of his shirt in a dumpster.

8         Petitioner contends that this new evidence would have impeached Deloney's

9    testimony that Petitioner confessed to her.  The Court disagrees.  Neither the declarations nor

10   the letters bear any relationship to Deloney's testimony that Petitioner confessed, and none

11   of the declarations call into question Deloney's veracity as a witness.  Thus, the situation at

12   hand is entirely distinguishable from the cases on which Petitioner relies, in which the

13   suppressed evidence directly implicated the veracity of a critical witness's statement.  *Kyles*,

14   514 U.S. at 441-45 (suppressed evidence was inconsistent statements by critical

15   eyewitnesses); *Banks v. Dretke*, 540 U.S. 668, 677-78 (2004) (suppressed evidence included

16   fact that a critical witness's testimony was coached, key witness was a paid police informant,

17   and both those witnesses committed perjury on the stand); *Horton v. Mayle*, 408 F.3d 570,

18   578-81 (9th Cir. 2005) (suppressed evidence revealed that central witness had an immunity

19   deal with the police for testifying against defendant).  As Petitioner points out (Dkt. 95 at 48-

20   50), and as summarized in this Order's factual background section, Deloney's lies and

21   inconsistent statements were brought out at trial and the new evidence does not provide any

22   additional impeachment.

23        In fact, this new evidence does not impeach or undermine any of the evidence

24   presented at trial – evidence which the jury found sufficient to convict Petitioner of murder.

25

26        [14]  Petitioner also submitted evidence regarding Fields's mental health issues and

27   criminal background.  (*See* Dkt. 109, Exs. B-G, K, L.)  However, Petitioner does not assert
     any basis for the admission of such evidence at a trial of Petitioner for DeLao's murder;

28   therefore, the Court does not consider it.

1    While the new information raises the implication that Fields could have been involved in

2    DeLao's murder, it does not diminish the evidence of Petitioner's guilt.  To the extent any

3    information in the letters was admissible, the Court agrees with Respondents that the

4    purported confession mentioned in the letters does not exculpate Petitioner; rather it affirms

5    Petitioner's involvement in the murder.  *See Morris v. Ylst*, 447 F.3d 735, 740 (9th Cir. 2006)

6    (finding evidence that others equally participated in the murder with defendant only

7    minimally exculpatory because it did not suggest he was not guilty).  Without more, neither

8    the letters nor the declarations developed therefrom are material because consideration of that

9    evidence does not establish a reasonable probability that Petitioner would not have been

10   convicted.  *See id.* (finding "marginally exculpatory or impeaching" evidence does not rise

11   to the level of a *Brady* violation).

12           As found by the Court in a prior order, Petitioner's allegations, supported by the

13   declarations of McKaney and Barnett, state a colorable *Brady* claim, particularly in light of

14   the circumstantial nature of the case against Petitioner.  However, given the opportunity,

15   Petitioner has not come forward with anything additional to bolster the merits of his claim.

16   Petitioner's discovery requests focused solely on gathering any additional information the

17   State possessed (*see* Dkt. 96), but did not seek to conduct any investigation regarding

18   McKaney, Barnett, or Fields.  Even after learning that Fields was not in custody at the time

19   of the crime, Petitioner has not requested further investigation or brought additional evidence

20   to the Court's attention.

21           The declarations are presumably the best evidence available to Petitioner in support

22   of this claim.  However, in the event of a new trial, these witnesses and their statements

23   would be subject for the first time to adversarial testing.  Challenges to the credibility and

24   reliability of McKaney and Barnett might note, for example, that their declarations, which

25   were executed more than nine years after the events in question, are not consistent with each

26   other; e.g., Barnett's version of events does not confirm McKaney's statement that she was

27   in the Casa Grande area with Barnett and Fields or her report that Fields burned his shirt in

28   the dumpster.  Further, the information in the declarations is not consistent with the

1   information provided in Sweat's letters, and the letters themselves erroneously describe the

2   manner in which DeLao was killed.  Finally, potential witnesses Sweat and McKaney would

3   be subject to questions of credibility regarding their jail-house discussions.

4          The Court finds that the absence of the new declarations did not deprive Petitioner of

5   a fair trial or undermine confidence in the jury's verdict.  Therefore, Petitioner has failed to

6   satisfy the materiality prong of *Brady*, and he is not entitled to relief on Claim 16.

7                                             **CONCLUSION**

8          The Court finds that Petitioner has failed to establish entitlement to habeas relief on

9   any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither

10  warranted nor required.

11         Accordingly,

12         **IT IS ORDERED** that Petitioner's Third Amended Petition for Writ of Habeas

13  Corpus (Dkt. 85) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

14         **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

15  to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

16  85007-3329.

17         DATED this 20th day of February, 2007.

18

19

20

21

22

23

24

25

26                              Paul G. Rosenblatt
                                United States District Judge

27

28